UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTOPHER VELTHEIM,

        Plaintiff,
v.                                  Case No. 8:16-cv-298-T-33JSS

INTERNATIONAL BODYTALK ASSOCIATION,
INC., JOHN VELTHEIM, and ESTHER
VELTHEIM,

        Defendants.
_____/

**ORDER**

For the second time, a son has sued his father, his former stepmother, and the family company in the context of corporate litigation regarding a family business. The first lawsuit, in which the son challenged his dismissal from employment from the family business, was resolved in a settlement agreement with the son signing a broad release. A Motion for Summary Judgment now before the Court asks the single question of whether the son's claims in the present lawsuit are barred by the release agreement the son signed to resolve the first lawsuit. The Court answers the question in the affirmative, and, as explained below, grants the Motion for Summary Judgment.

**I.    Background**

International Bodytalk Association, Inc. is "a domestic profit corporation chartered in the State of Florida on June

23, 2003, with a principal address . . . [in] Sarasota, Florida." (Doc. # 42 at ¶ 4). International Bodytalk Association, Inc. (hereafter "the Company") is "a wellness and life sciences educational organization . . . with branches in Australia and Europe, offering training and education to more than 40,000 people worldwide." (Id. at ¶ 18).

John Veltheim is the President of the Company and Christopher Veltheim is his son.[1] (Id. at ¶¶ 5, 19). Esther Veltheim is the Treasurer of the Company. (Id. at ¶¶ 6, 19). She was previously married to John, but Esther and John have divorced. (Id. at ¶ 19). Esther is Christopher's former stepmother. (Id.).

Christopher submits that he was issued ten shares in the Company on June 19, 2003. (Doc. # 1 at ¶ 9). Thereafter, on December 21, 2012, Christopher claims that ten additional shares were transferred to him, increasing his total ownership in the Company to 20 shares. (Id. at ¶ 11). His counsel contends that Christopher has a 20% ownership interest in the Company. (Doc. # 60-1 at 10).

Christopher, John, and Esther have been embroiled in litigation concerning the Company in the United States and in

---

[1] Because the parties share the same last name, the Court will refer to them by their first names.

Australia. Christopher explains that "beginning in 2014, the parties' relationship suffered from increased tensions between them." (Id. at ¶ 27). Christopher had been working for the Company since November 30, 2007, but John and Esther terminated Christopher from the Company. (Id., Doc. # 51-4 at 2). On April 17, 2015, Christopher filed an unfair dismissal claim with the Fair Work Commission in Australia against the Company as well as John and Esther, challenging his termination. The employment litigation was resolved on May 20, 2015, in a settlement. (Id.). In the settlement, Christopher received:

> (i) Payment of 20.37 weeks of accrued and unused annual leave entitlements, amounting to a total of $32,026.73; (ii) Payment of 4 weeks' pay in lieu of notice, amounting to a total of $6,289 plus $597.46 superannuation . . . ; (iii) An ex-gratia payment equal to 16 weeks' base salary, amounting to $25,156; (iv) 6.4278 weeks' long service leave, amounting to $10,106.11, (v) **Less** the amount of $34,659 AUD . . . to be deducted in full and final satisfaction of the car loan amount that was provided by IBA Australasia's U.S. parent company.

(Doc. # 51-4 at 3-4)(emphasis in original).

In exchange for monetary payment and to effectuate the settlement of the lawsuit regarding the termination of his employment, Christopher signed a lengthy Release Agreement. Among other key terms, the Release Agreement provides:

**2.3 Release**

3

    (a) Mr Veltheim understands and acknowledges that this release agreement constitutes full and final settlement of all monies that are owing to him in respect to his Employment[2] and the termination of the employment relationship and any and all Claims which may arise out of his Employment or the termination of the employment relationship with IBA Australasia and/or International BodyTalk Association, Inc. This includes, but is not limited to, payment for all services performed by Mr Veltheim on behalf of IBA Australasia in Australia, the United States or any other location during the entire period of his employment.

    (b) Mr Veltheim releases and absolutely and forever discharges IBA Australasia, its parents, subsidiaries, affiliates, successors and assigns in the IBA Group, and any and all of their current, former or future directors, office holders, agents or employees from all Claims[3] whatsoever (whether at common law, in equity or under any statute which may be legally waived by Mr Veltheim), past present and future and howsoever arising, known or unknown to Mr Veltheim, which he may have had, may now have or but for this release agreement may have had at any future time against IBA Australasia, International BodyTalk Association Inc. or any other company within the IBA Group, arising out of or in relation to the Employment or termination of the employment relationship. Mr Veltheim

---

[2] The Release Agreement defines "Employment" as "the employment of Mr Veltheim by IBA Australasia and/or International BodyTalk Association, Inc." (Doc. # 51-4 at 3).

[3] The Release Agreement defines "Claims" as "all actions, suits, applications, arbitrations, causes of action, complaints, costs, damages, debts due, demands, determinations, enquiries, judgements, liabilities, sums of money and verdicts whatsoever and however arising whether at law or in equity under any statute." (Doc. # 51-4 at 2).

      understands and agrees that his release of Claims also applies to Claims by any person by, through or under Mr Veltheim, such as Mr Veltheim's heirs, executors, administrators or assigns. **Further, Mr Veltheim understands, acknowledges and agrees that he is releasing the releasees from any and all Claims which may include, but are not limited to, Claims in Australia and the United States for breach of contract, personal injury (except for any claims Mr Veltheim may be entitled to make under applicable Workers' compensation laws in Australia), wages, benefits, defamation, unfair dismissal, breach of general protections, wrongful discharge, bullying, retaliation, claims for discrimination or harassment in employment under the applicable laws of the United States or Australia, and any and all rights and claims Mr Veltheim may have arising under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Genetic Information Non-Discrimination Act, and the Equal Pay Act, all as amended, and any and all Claims based on any oral or written agreements or promises, whether arising under statute (including, but not limited to, claims arising under the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act and the Fair Work Act of 2009 (Cth) and any other federal, state, local, or foreign laws or regulations), contract (express or implied), tort, constitutional provision, common law, public policy or otherwise, from the beginning of time through the date Mr Veltheim signs this release agreement.**

(c)  Mr Veltheim promises not to bring or commence or seek to enforce any Claims in any court, commission, tribunal, or body in any jurisdiction within or outside of Australia, the United States or any other jurisdiction, against IBA Australasia, International

> BodyTalk Association Inc. or any other company within IBA Group, or any current or former directors, office holders, agents or employees of IBA Australasia, International BodyTalk Association Inc. or the IBA Group, arising out of or in relation to the Employment or termination of the employment relationship. This includes any demand for arbitration against releasees.

(Doc. # 51-4 at 6-7)(emphasis added).

On February 8, 2016, approximately nine months after signing the Release Agreement, Christopher initiated this action against John, Esther, and the Company seeking, among other things, an accounting, damages, corporate dissolution and liquidation, the appointment of a receiver, and the imposition of a constructive trust. (Doc. # 1). Among other contentions, Christopher claims that in 2003, John and Esther purported to transfer Christopher's "original ten shares in [the Company] to Defendants John Veltheim and Esther Veltheim, without [Christopher's] knowledge, authority, or consent." (Doc. # 42 at ¶ 13). Along with seeking dissolution of the Company and payment for his shares from the proceeds of the dissolution, Christopher complains about his forced "termination from the corporation and/or partnership through deceit and fraud." (Id. at ¶ 35). Christopher also claims that John and Esther have wasted corporate assets (alleging excessive compensation in 2013, and unauthorized royalties in

6

2014, as examples of such corporate waste). Christopher also describes alleged sexual misconduct by John against a student in 2014, in the Second Amended Complaint. (Id. at ¶ 39).

The Second Amended Complaint contains the following specific counts: action for involuntary dissolution, liquidation, purchase of shares, or other equitable relief (count one); equitable accounting and dissolution of International Bodytalk Association, Inc. (count two); declaratory relief (count three); and libel, slander, and slander per se (count four). On September 2, 2016, Defendants filed an Answer, Affirmative Defenses, and the following Counterclaims: breach of fiduciary duty (count one); conversion (count two); breach of contract (count three); breach of implied in fact contract (count four); unjust enrichment (count five); and money lent (count five). (Doc. # 47). Christopher failed to respond to the counterclaims, and the deadline for him to do so has passed. John, Esther, the Company failed to apply to the Clerk for Entry of a Default pursuant to Rule 55 of the Federal Rules of Civil Procedure. The Court dismisses the Counterclaims without prejudice based on the finding that John, Esther, the Company have failed to prosecute the counterclaims. See Local Rule 1.07(b), M.D. Fla.

On October 20, 2016, John, Esther, and the Company filed

a Motion for Summary Judgment and Notice of Intent to Rely on Foreign Law (Doc. # 51).  Christopher filed a Response in Opposition to the Motion (Doc. # 55) on November 28, 2016, to which John, Esther, and the Company replied (Doc. # 60) on December 27, 2016.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing

the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists

of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

    **A.    Application of Foreign Law**

The sole task at hand is determining whether Christopher's claims asserted in the Second Amended Complaint are barred by the Release Agreement. The Release Agreement states that it "is governed by and construed in accordance with the laws applicable in the State of Queensland." (Doc. # 51-4 at 10). Rule 44.1, Fed. R. Civ. P., states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a question of law.

See Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla, 966 F.2d 613, 616 (11th Cir. 1992)(affirming district court's utilization of affidavits from a solicitor of the Supreme Court of England and Wales to determine the laws of England in the context of a maritime dispute).

This Court was provided with adequate notice that foreign

10

law applies.  In addition, Christopher, John, Esther, and the Company agree that the law of Queensland, Australia governs this matter.  For his part, Christopher has provided the affidavit of Andrew Herbert, Barrister at Law (Doc. # 55-2). And Defendants -- John, Esther, and the Company -- submit the sworn declarations of Cameron Kenneth Dean, Solicitor. (Doc. # 51-5; Doc. # 60-2).

**B.    The Release Agreement Bars Christopher's Claims**

The Court credits the affidavit of Barrister Herbert, stating that "[t]he fundamental rule of interpretation of agreements under Australian law, is that the agreement must be read as a whole, in context, and by ascertaining the plain English meaning of the words the parties used." (Doc. # 55-2 at 5).

The Court agrees with Christopher's argument that the Release Agreement was executed in the context of resolving Christopher's unfair dismissal lawsuit.  The Court, however, rejects Christopher's assertion that the Release Agreement should be interpreted narrowly and such that Christopher should be able to bring myriad claims against John, Esther, and the Company, dating back to 2003, when Christopher specifically released these parties from these claims in the

11

Release Agreement in 2015. The Court disagrees with Barrister Herbert's contention that "the Release Agreement, by its express terms, is dedicated only to the employment relationship and its termination." (Doc. # 55-2). A plain reading of the Release Agreement shows that the parties intended to effect a global settlement of all pending matters.

The Court starts with an analysis of the "recitals" of the Release Agreement. The recitals explain (1) that Christopher was employed from November 30, 2007, until April of 2015, when he was dismissed from the Company; (2) Christopher filed an Unfair Dismissal Claim in Australia; and (3) "without any admission of liability, the parties have agreed to enter into this release agreement **to finalise all matters between them** and any Claims that Mr Veltheim may now have or which may arise as a result of the Employment or the end of the employment relationship between the parties." (Doc. # 51-4 at 2)(emphasis added).

The purpose of the Release Agreement was not just to end the disagreement regarding Christopher's termination from the Company, but also to "finalise all matters" between the parties and the resolve any and all "Claims." As noted, the parties did not limit the definition of "Claims" to labor and

12

employment matters. Instead, the parties' broadly defined "Claims" as "all actions, suits, applications, arbitrations, causes of action, complaints, costs, damages, debts due, demands, determinations, enquiries, judgements, liabilities, sums of money and verdicts whatsoever and however arising whether at law or in equity or under any statute." (Doc. # 51-4 at 2). In addition, had the parties sought to restrict the claims to the finite period of Christopher's employment, they could have established that limited period for claims, instead of setting the inception of the release period as "the beginning of time." (Doc. # 51-4 at 7). The four causes of action that Christopher asserts against John, Esther, and the Company fall within the broad definition and sweeping time period for "Claims" contained in the Release Agreement.

Christopher points out that certain portions of the Release Agreement contain limiting language, specifically "arising out of or in relation to the Employment or termination of the employment relationship." That language does indeed appear in several sentences of the Release Agreement. However, paragraph 2.3(b) is not limited to the employment context and contains no limiting language:

> Further, Mr Veltheim understands, acknowledges and agrees that he is releasing the releasees from any and all Claims which may include, but are not limited to, Claims in Australia and the United

> States for breach of contract, personal injury (except for any claims Mr Veltheim may be entitled to make under applicable Workers' compensation laws in Australia), wages, benefits, defamation, unfair dismissal, breach of general protections, wrongful discharge, bullying, retaliation, claims for discrimination or harassment in employment under the applicable laws of the United States or Australia, and any and all rights and claims Mr Veltheim may have arising under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Genetic Information Non-Discrimination Act, and the Equal Pay Act, all as amended, and any and all Claims based on any oral or written agreements or promises, whether arising under statute (including, but not limited to, claims arising under the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act and the Fair Work Act of 2009 (Cth) and any other federal, state, local, or foreign laws or regulations), contract (express or implied), tort, constitutional provision, common law, public policy or otherwise, from the beginning of time through the date Mr Veltheim signs this release agreement.

(Doc. # 51-4 at 6).

This separate and specific release is not limited to releasing claims specifically in relation to Christopher's employment or termination from employment. This broad release language directly bars Christopher from bringing the current lawsuit against John, Esther, and the Company -- the parties specifically intended to be released from such Claims. The Release Agreement is dated May 20, 2015. Yet, the Second Amended Complaint alleges that Defendants (1) effected an unauthorized transfer of Christopher's shares in 2003; (2)

14

wasted assets in 2013; and (3) made unauthorized royalty payments in 2014, among many other contentions predating the Release Agreement. Christopher released the Defendants of these claims in the Release Agreement.

The Court takes note of Barrister Herbert's description of a prior hearing held in Australia on January 13, 2016, in which "Daubney J., in the Supreme Court of Queensland, dismissed an application in *IBA Australasia Pty Ltd and Another and Christopher Veltheim*, No 9996 of 2015, which application relied upon the . . . argument . . . that the Release Agreement barred Mr Veltheim from seeking to enforce rights in relation to the transfer of shares owned or allegedly owned by him." (Doc. # 55-2). Apparently, during that hearing, in which injunctive relief was requested by John, Esther, and the Company and denied by the court, the Australian Justice asked: "he stopped being an employee, but he's still a shareholder, isn't he?" (Id.). Barrister Herbert maintains that because Justice Daubney denied a petition for injunctive relief, that this Court should deny the Motion for Summary Judgment. This position is flawed. The question of whether John, Esther, and the Company were entitled to an injunction in Australia is not the same issue before this Court, and, as explained in Defendants' reply, "Justice

15

Daubney did not consider Section 2.3(b) [of the Release Agreement], or crucially, any argument which went to the merits of the claims which Plaintiff has brought in this lawsuit." (Doc. # 60 at 6). A written opinion reflecting the denial of injunctive relief was not issued by the Australian tribunal. In addition, Christopher has not filed a complete transcript of the hearing held in Australia on January 13, 2016. Instead, Christopher filed a two-page excerpt. (Doc. # 55-1). This document does not reflect the Australian Court's ruling. Instead, it reflects some of the questions asked at the hearing. The Court would be embarking on an reckless course if it were to ascribe precedential value to the preliminary questions considered by a Court during a hearing. The Court roundly rejects Barrister Herbert's proposition that Justice Daubney's questions and impressions in the excerpt from the transcript represent the law of Australia.

Furthermore, the Court takes note of the undisputed fact that Christopher signed the Release Agreement in the presence of his attorney and with the benefit of legal representation. Other sections of the Release Agreement reflect that Christopher (1) carefully read and understood the Release Agreement; (2) was given sufficient time to consider his rights and obligations under the Release Agreement; (3)

enjoyed the benefit of legal counsel; (4) understood that in signing the Release Agreement he was giving up certain legal rights; (5) voluntarily chose to enter into the Release Agreement and was not forced, coerced, or pressured to enter into the Release Agreement; and (6) did not rely on any representation or statements not contained in the Release Agreement. (Doc. # 51-4 at 9).

Christopher also agreed in the Release Agreement: "Further, by signing this release agreement, Mr Veltheim agrees that he is not entitled to any payments and/or benefits that are not specifically listed in this release agreement including, but not limited to, any benefits of International BodyTalk Association Inc. under either Australian or United States Law." (Id. at 4).

Solicitor Dean summarizes the law of Queensland, Australia in his Declaration. (Doc. # 51-5). "In order for a binding agreement to be formed, there needs to be: (a) offer and acceptance of terms; (b) valuable consideration provided; and (c) an intention to be legally bound. There must also be certainty as to the terms agreed." (Id. at 12). Solicitor Dean argues that offer and acceptance, valuable consideration, and an intent to be bound are present here, and the Court agrees with his analysis. "The Release Agreement sets out the terms

17

of the agreement reached and has been signed by all parties." (Id.). It cannot be disputed that Christopher received valuable consideration, the payment of thousands of Australian dollars, in exchange for his signature on the Release Agreement. And, "each of the beneficiaries (relevantly for the US Proceeding being International BodyTalk Association, Inc., John Veltheim, and Esther Veltheim) have signified their acceptance of the benefits offered to them by Christopher Veltheim by signing the Release Agreement." (Id. at 14). In addition, "[t]he language and terms of the Release Agreement make it clear that the parties intended to be bound by it." (Id.).

With respect to "certainty of terms" Solicitor Dean remarks:

> The terms of the releases in the Release Agreement are drafted to have broad coverage. The terms evince an intention to settle not only the unfair dismissal claim, but also all other "Claims" that arise out of or are in relation to the "Employment" and termination of the employment relationship . . . . Clause 2.3(b) of the Release Agreement goes even further and, relevantly, from the sentence commencing with the word "Further" onwards describes releases not limited to the Employment or the employment relationship, but describes releases from "any and all Claims," which is then followed by a non-exhaustive list of Claims in Australia and the United States in favour of the "releasees." While the term "releasees" is not defined in the Release Agreement, it is clear from the terms of the Release Agreement that the persons to benefit from the release offered include

18

>    International BodyTalk Association, Inc., John
>    Veltheim and Esther Veltheim as being parties to
>    the Release Agreement. Relevant to the US
>    Proceeding, the list of Claims to be released
>    include Claims in the United States for
>    "defamation" and "any and all Claims based on any
>    oral or written agreements or promises" including
>    those that may arise "under statute" from " . . .
>    the beginning of time through the date that Mr
>    [Christopher] Veltheim signs this release
>    agreement." The terms of the release in clause
>    2.3(b) of the Release Agreement described above
>    uses the words "including but not limited to" when
>    describing the list of Claims released. The use of
>    these words means that the rule of construction
>    known as "ejusdem generis" will not apply so as to
>    limit the operation of the releases to only Claims
>    that arise out of or in relation to the
>    "Employment" and the termination of the employment
>    relationship. The term "ejusdem generis" comes
>    from Latin and means "of the same kind." The
>    "ejusdem generis" rule of construction is that
>    where general words follow specific words, the
>    general words may be limited to the same kind as
>    the specific words. Before the rule can apply, it
>    must be shown that the specific words make up a
>    common class or genus. However, because there are
>    specific words included in clause 2.3(b) of the
>    Release Agreement that make it clear that the class
>    of matters to be released is not limited by the
>    list of terms used, the rule cannot apply.

(Id. at 14-15). Solicitor Dean also declares that the Release Agreement does not violate public policy (Id. at 20) and that in his opinion, "based on the law that applies in the State of Queensland, Australia, the claims made in the US Proceedings, as set out [in the Second Amended Complaint], would each be the subject of the releases contained in clause 2.3(b) of the Release Agreement." (Id.).

19

The Court adopts the reasoning of Solicitor Dean and independently finds that the causes of action brought in the Second Amended Complaint by Christopher against John, Esther, and the Company are barred by the Release Agreement. The Motion for Summary Judgment is accordingly granted.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

(1) Defendants' Motion for Summary Judgment (Doc. # 51) is **GRANTED.** Plaintiff's Second Amended Complaint is dismissed because the claims he asserts are barred by the Release Agreement dated May 20, 2015.

(2) The Clerk is directed to issue a Judgment in favor of Defendants John Veltheim, Esther Veltheim, and International BodyTalk Association, Inc. reflecting that Plaintiff Christopher Veltheim's claims asserted in the Second Amended Complaint are barred by the Release Agreement dated May 20, 2015.

(3) The Clerk shall close the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>5th</u> day of January, 2017.

*[signature]*
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE